**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0532-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMEL CARLTON, a/k/a
JAMEL A. CARLTON,
JAMAL CARLTON, and
GHOST J,

    Defendant-Appellant.

_____

Argued October 16, 2024 – Decided November 27, 2024
Resubmitted December 19, 2024 – Decided December 19, 2024

Before Judges Sumners, Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 20-12-0711.

Michael Timothy Denny, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Michael Timothy Denny, of counsel and on the briefs).

David M. Galemba, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Mercedes Robertson, Deputy Attorney General, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant Jamel Carlton appeals from his jury trial convictions for aggravated sexual assault, sexual assault, aggravated assault, burglary, and criminal restraint against an Atlantic City casino-hotel housekeeper. The State presented surveillance video recordings captured by multiple cameras throughout the casino-hotel. The State also introduced DNA evidence showing that defendant sexually penetrated the victim, and photographic evidence of her injuries, corroborating her testimony that the encounter was violent and not consensual. The trial judge sentenced defendant as a persistent offender to a forty-two-year prison term.

Defendant contends for the first time on appeal that his Confrontation Clause rights were violated when the trial judge allowed the jury to hear lay opinion testimony regarding the identification of the suspect shown on surveillance video. He also contends the trial judge erred by preventing him from introducing evidence about the victim's prior sexual conduct and from discussing a newspaper article from 2005 describing prostitution activities at the same casino-hotel where the present crimes were committed in February 2018—thirteen years after the article was published. In a self-represented

2

brief, defendant raises several other contentions, including allegations of prosecutorial misconduct. After carefully reviewing the record in light of the parties' arguments and governing legal principles, we affirm defendant's convictions.

Defendant also challenges his forty-two-year extended term sentence as a persistent offender. In his initial appeal brief, defendant argued the trial judge erred in finding that he was a persistent offender under N.J.S.A. 2C:44-3(a) based on two prior New York felony convictions—one committed in 2006 and the other committed in 2011. He also argued the trial judge abused her discretion by electing to impose an extended term of imprisonment after finding that defendant was eligible for an enhanced sentence as a persistent offender.

After the initial briefs were filed, the United States Supreme Court decided Erlinger v. United States, 602 U.S. 821 (2024), holding that under the Fifth and Sixth Amendments, a jury—not a sentencing judge—must decide whether prior convictions used to establish the basis for enhanced sentencing had been committed on separate occasions. The majority in Erlinger explained that the Supreme Court was not creating a new rule, but merely applying constitutional principles it had previously announced following its

3

groundbreaking decision, Apprendi v. New Jersey, 530 U.S. 466 (2000). It is undisputed, however, that Erlinger abrogates New Jersey Supreme Court precedent that embraced a contrary interpretation of the Apprendi doctrine, State v. Pierce, 188 N.J. 155 (2006). Erlinger thus necessitates a significant change to New Jersey practices and procedures for imposing a persistent-offender extended term of imprisonment under N.J.S.A. 2C:44-3(a).[1]

The State acknowledges the Erlinger rule applies retroactively to "pipeline" cases and thus, defendant's Fifth and Sixth Amendment rights were violated when the judge rather than a jury decided that he was eligible for a persistent offender extended term. The Attorney General nonetheless urges us to apply the harmless constitutional error doctrine to affirm defendant's extended-term sentence.

To be sure, the approach advocated by the Attorney General would conserve substantial judicial and prosecutorial resources by obviating the need to remand an untold number of pipeline cases for new jury trials. We are nonetheless unpersuaded the harmless constitutional error doctrine can be applied in this case without eviscerating the Erlinger rule. We are concerned

---

[1] We presume the Erlinger rule also applies to New Jersey's "three strikes" law, N.J.S.A. 2C:43-7.1, which likewise requires a finding that the prior crimes were committed on "separate occasions."

A-0532-22

that the essential nature of a harmless error analysis—which focuses on whether the same outcome would have been reached if the error had not occurred—runs counter to the Erlinger Court's stern admonition that "[t]here is no efficiency exception to the Fifth and Sixth Amendments." 602 U.S. at 842. The Court added, "[i]n a free society respectful of the individual, a criminal defendant enjoys the right to hold the government to the burden of proving its case beyond a reasonable doubt to a unanimous jury of his peers 'regardless of how overwhelmin[g]' the evidence may seem to a judge." Ibid. (alteration in original) (quoting Rose v. Clark, 478 U.S. 570, 578 (1986)).

Furthermore, the Attorney General candidly acknowledged at oral argument that its harmless error argument would likely apply to most pipeline cases. That suggests, as a practical matter, the harmless error exception might swallow the rule, rendering hollow its retroactive application.

In the absence of further guidance from the United States Supreme Court on permissible exemptions to the Erlinger rule, we are constrained to vacate defendant's persistent-offender extended-term sentence and remand to the Law Division with instructions on how to remedy the constitutional violation.

I.

We discern the following facts and procedural history from the record.

A-0532-22

The victim, N.K.,[2] was employed as a housekeeper at a casino-hotel. On February 10, 2018, defendant approached her while she was working on the fourth floor. He asked her to assist him in accessing room 496, claiming that his girlfriend was inside. N.K. advised that she could not assist him because she did not have the key to that room. She instructed defendant to go to the hotel front desk to obtain a new key card.

Defendant left the fourth floor but returned after approximately ten minutes. He informed N.K. that he could not obtain a new key card at the front desk because he did not have identification. N.K. suggested that defendant knock on the door so that his girlfriend would let him in.

N.K. went about her work cleaning rooms assigned to her, eventually moving to room 495. While cleaning that room, N.K. retrieved supplies from her cart in the hallway, but only after checking to see if defendant had left the area. N.K. opened the door "just enough . . . to get out of the door to get supplies." Suddenly, defendant jumped on top of her, covered her mouth and nose, and threw her onto the floor inside the room.

---

[2] We use initials to protect the identity of the sexual assault victim. R. 1:38-3(c)(12).

Defendant punched N.K. repeatedly, dragged her to the bathroom by her hands, and banged her head. Defendant then dragged the victim out of the bathroom towards the bed and threw her to the floor. Defendant removed her pants, underwear, and socks while telling her that he was going to rape her. N.K. repeatedly testified that she thought she was going to die.

Next, defendant threw N.K. onto the bed face up and covered her nose and mouth. N.K. felt suffocated. While continuing to cover the victim's nose and mouth, defendant inserted his penis into her vagina. Defendant also kissed her foot and licked her toe. Defendant instructed her not to tell anyone about the rape and threatened to kill her if she did.

N.K. testified the sexual assault occurred "[a]round eleven" in the morning or "a little bit after." She could not recall the duration of the attack because she "was so scared at that moment."

After the attack, N.K. heard a door close and believed defendant had left the hotel room. When she tried to get out of the room, she realized defendant was in the bathroom. Defendant ordered her to lie back down on the bed face down. While she was on the bed, defendant searched through her bag, found a cellphone, and discarded it in the trash bin.

A-0532-22

When N.K. believed that defendant had finally left the room, she locked the door, retrieved her cellphone, and called her supervisor. She requested her supervisor come up to the fourth floor because "someone raped . . . and assault[ed] [her]." The housekeeping supervisor arrived at the fourth floor and saw N.K. sitting against the open door to room 495, crying. The housekeeping supervisor testified that she saw a "red mark on [N.K.'s] face" that looked like "she [had] been punched." N.K. informed her that defendant had taken her "key card and i[P]od." The housekeeping supervisor relayed this information to security and her manager, and police were called.

The security supervisor at the casino-hotel, one of the security personnel on scene at room 495, testified that he received a dispatch call around 11:30 a.m. reporting "[t]hat a room attendant had been assaulted." He entered the room and saw the housekeeping supervisor consoling N.K., who appeared "[d]istraught," "very upset," and was "crying a lot." He also noticed "a red mark on her cheek." The security supervisor was present when N.K. provided a description of defendant and informed security that defendant had attempted to gain access to room 496. N.K. described the assailant as a Black man with a medium build wearing an earring, gray hoodie, and black pants and shoes. The security supervisor also contacted the front desk and spoke with a hotel receptionist who

8

confirmed that a male, later identified as defendant, "attempt[ed] to get a key ... [to] gain access to [room 496]," but did not have access to rooms 495 and 496, or the fourth floor.

A hotel receptionist who worked the front lobby on February 10, 2018 testified that she was approached by a man who requested access to room 496. She described the man as a "difficult guest." The receptionist asked defendant for his identification and confirmed that his name was not on the reservation for the room. She also called room 496 but no one answered. Although defendant was insistent, the receptionist informed him that she was unable to provide him with a room key. Defendant walked away "upset" and "frustrated."

Emergency medical and Atlantic City Police Department (ACPD) personnel responded to the scene of the attack. An ACPD detective testified that N.K. appeared "distraught," "upset," and had "swelling to the jaw area." Based on the description of the attacker that N.K. provided, the detective reviewed hotel surveillance video and identified the suspect. According to the detective, casino security personnel were aware of the suspect's identity from a domestic violence incident that occurred earlier that morning. The detective testified that he reviewed the surveillance footage, which showed a man wearing a "gr[a]y sweatshirt, black pants[,] and black colored Air Jordan sneakers" with

9

"a doo-rag on at the time" moving through the casino and stairwell. At trial, the detective identified defendant as the man in the video.

The detective asked casino security to "locate all video footage of [defendant] from . . . before and after the assault." A security specialist employed by the casino reviewed the video surveillance footage to locate the suspect based on a photograph of defendant. He provided a DVD to ACPD containing the video surveillance files.

At trial, the State played for the jury portions of the video surveillance video files and the security specialist provided narration. The video showed two men, including the one the security specialist was "following," in an elevator located on the second floor of the casino-hotel at 10:09 a.m. The man was wearing a gray hoodie, black pants, and black shoes, similar to the description given by N.K.

At 10:11 a.m., the suspect exited the elevator and entered a different elevator, eventually arriving on the fourth floor at 10:17 a.m. Around 10:26 a.m., the suspect is seen re-entering the elevator on the fourth floor, taking it to the second floor, walking to the front desk, and speaking with a hotel receptionist. The suspect left the front desk at 10:28 a.m. and attempted to use an elevator to travel to another hotel floor, but that attempt was unsuccessful

A-0532-22

without a room key.[3]  At 10:30 a.m., the suspect got off the elevator at the eighth floor.  Once on the eighth floor, the suspect entered an emergency exit stairwell, which, the security specialist testified, "was the closest stairwell to [room 496]."

At 11:22 a.m., the suspect was seen running down the second-floor hallway, no longer wearing the gray hoodie or dark gray polo underneath.  The security specialist testified that the other floors in that part of the hotel did not have surveillance cameras like the second floor.

Video shows that at 11:23 a.m., the suspect ran out of the hotel's second floor to the parking garage while holding the dark gray polo shirt.  When another camera records the suspect approaching the parking garage elevators, the suspect is no longer holding the polo shirt.  The suspect then exited the garage through a stairwell and ran across the street off the property.

The security specialist testified that, based on his observation of the suspect's missing polo shirt, he went to the third floor of the parking garage to look for it and found a gray polo hoodie in the trash can.  The ACPD detective

---

[3]  The security specialist testified that an individual without a key card could gain access to another hotel floor if another hotel guest selected that floor or if the elevator was called to that floor while the key-less individual was in the elevator.

also testified that a gray sweatshirt was found on the eighth floor and was recovered from lost-and-found.

Forensic evidence was recovered from the victim's person. Medical personnel transported N.K. by ambulance to the Atlantic City Medical Center, where a certified sexual assault nurse examiner conducted a forensic sexual assault examination. As part of that examination, the nurse photographed N.K.'s injuries. The photos show abrasions to her left temple and right wrist; bruising on the left side of her neck, as well as her knee, legs, and left hand and wrist; and redness on her left cheek. The nurse also performed a gynecological examination, collecting swabs of N.K.'s vagina and cervix as well as her mouth and right toes.

The swabs were submitted to the New Jersey State Police Office of Forensic Sciences (NJSP OFS) for analysis. The results indicated that sperm was located on the vaginal swabs, cervical swabs, and N.K.'s underwear. The vaginal, cervical, and foot swabs, in addition to a portion of N.K.'s underwear, were sent to the NJSP OFS DNA Laboratory for further testing. A NJSP OFS forensic scientist and expert in the field of forensic DNA analysis determined defendant was the source of the sperm fractions found on the vaginal, cervical, and foot swabs, as well as on N.K.'s underwear.

While enroute to the hospital to interview N.K., the ACPD detective spotted defendant on the 1800 block of Atlantic Avenue. Photographs of defendant were taken during that encounter. Those photos depict defendant wearing a white t-shirt, black pants, and Air Jordan sneakers.

B.

Defendant was charged in a superseding indictment with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(l) (count two); second-degree burglary, N.J.S.A. 2C:18-2(a)(l) (count three); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7) (count four); third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (count five); fourth-degree obstructing administration of law, N.J.S.A. 2C:29-l(a) (count six); and a disorderly persons offense for resisting arrest, N.J.S.A. 2C:29-2(a)(1).

A jury trial was held in March 2022. The jury found defendant guilty on counts one through five. On September 7, 2022, the trial judge sentenced defendant to an extended term of imprisonment as a persistent offender, N.J.S.A. 2C:44-3(a). After merger, on count one, the judge imposed an aggregate term of forty-two years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge further imposed parole supervision

for life, N.J.S.A. 2C:43-6.4, and ordered defendant to abide by the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23. On counts four and five, the judge sentenced defendant to two five-year prison terms to run concurrently with each other and the sentence imposed on count one. The judge dismissed count six and the disorderly persons offense. This appeal followed.

II.

Defendant raises the following contentions for our consideration in his counseled brief:

POINT I

THE STATE IMPROPERLY BOLSTERED ITS CASE WITH INADMISSABLE HEARSAY AND INADMISSIBLE LAY OPINION TESTIMONY IMPLICATING THE DEFENDANT AS THE PERPETRATOR IN VIOLATION OF THE CONFRONTATION CLAUSE AND N.J.R.E. 701.

A. [The ACPD Detective] And [The Security Specialist]'s Identifications Of The Man In The Video As Carlton Violated N.J.R.E. 701.

B. Admission Of [The ACPD Detective] And [The Security Specialist]'s Hearsay Testimony That [The Casino-Hotel]'s Had Identified Carlton As The Suspect Violated The Confrontation Clause.

POINT II

THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT TO A COMPLETE DEFENSE BY

14

LIMITING THE EVIDENCE REGARDING PROSTITUTION.

POINT III

DEFENDANT'S EXTENDED TERM SENTENCE OF 42 YEARS WITH AN 85% PAROLE DISQUALIFIER IS MANIFESTLY EXCESSIVE.

Defendant raises the following additional contentions in his self-represented brief:

POINT I

Whether Defendant's right to Miranda was violated under the Constitution of New Jersey and the Constitution of [the] United States.

POINT II

Whether Defendant was denied his right to be free from unreasonable search and seizure under the United States Constitution and the New Jersey Constitution.

POINT III

Whether Defendant['s] right to Speedy Trial was denied under the Due Process of Law.

POINT IV

Whether Trial Court erred when it allowed the DNA into evidence.

POINT V

Whether Trial Court erred when it refused to put the time of the crime in the Jury Charge denying defendant an unfair Jury and Due Process of Law.

POINT VI

Whether Prosecutorial Misconduct led to defendant being found Guilty by an unfair Jury.

POINT VII

Whether the Defendant was denied his right to Discovery.

Defendant raises the following contention in an initial supplemental brief filed by leave granted following the United States Supreme Court's decision in Erlinger[4]:

POINT I

THE FIFTH AND SIXTH AMENDMENTS AND APPRENDI V. NEW JERSEY, 530 U.S. 466 (2000), REQUIRE THAT A JURY DECIDE THE

---

[4] We note both parties submitted abbreviated supplemental briefs. Defendant submitted a thirteen-page brief along with his motion for leave to file a supplemental brief, which we granted. We directed the State to file a responsive supplemental brief no longer than fifteen pages. We did not permit a reply brief. We add that neither party requested oral argument. We sua sponte scheduled oral argument limited to the Erlinger-related issues. Five weeks after we heard oral argument, defendant submitted a letter-brief along with a motion for leave to file a second supplemental brief. We accepted the second supplemental brief for filing and directed the State to file a reply brief.

16

EXISTANCE OF THE FACTS NECESSARY TO ESTABLISH THE PREDICATE FOR AN EXTENDED TERM UNDER N.J.S.A. 2C:44-3A.

By leave granted after oral argument on this appeal, defendant raises the following new contention in a second supplemental brief:

THIS COURT CANNOT REWRITE THE PLAIN LANGUAGE OF THE PERSISTENT OFFENDER STATUTE, AND THERE IS NO AUTHORITY FOR A COURT TO EMPANEL A JURY TO DETERMINE WHETHER A DEFENDANT QUALIFIES AS A PERSISTENT OFFENDER.

### III.

We first address defendant's contention that his Confrontation Clause rights were violated when two State witnesses testified about how they became aware that defendant was the suspect. Prior to trial, defendant moved to preclude the State from referring to a domestic violence incident that led to the identification of defendant as the person who sexually assaulted N.K. On the morning of the sexual assault, defendant was involved in a domestic violence episode with his girlfriend in room 496. Defendant was arrested at the hotel at approximately 5:30 a.m. and released from police custody at 9:00 a.m. He then returned to the casino-hotel and attempted to regain entry to his girlfriend's hotel room.

17

During the in limine hearing, the State agreed not to present any evidence of the domestic violence incident or arrest in its case-in-chief. The State also agreed that officers would testify only generally that they were aware of defendant as the suspect. Defense counsel did not object to the State pursuing that approach. Nor did defendant object when the State's witnesses testified that casino security personnel were familiar with defendant and provided a picture of him to police officers to assist in the sexual assault investigation. Defendant claims for the first time on appeal that this testimony violated his confrontation rights.

"The Confrontation Clause 'prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony.'" State v. Williams, 219 N.J. 89, 98 (2014) (quoting State ex rel. J.A., 195 N.J. 324, 342 (2008)). But "[t]he right of confrontation, like other constitutional rights, may be waived by the accused." Ibid. A defendant can waive this right "by failure to object to the offending evidence[.]" Melendez-Diaz v. Massachusetts, 557 U.S. 305, 313 n.3 (2009). Indeed, our Supreme Court has stated that "[t]he defendant always has the burden of raising [their] Confrontation Clause objection[.]" Williams, 219 N.J. at 99 (citing Melendez-Diaz, 557 U.S. at 328). Articulated another way, generally, a defendant "must

attempt to exercise [their] confrontation right and object when necessary, if [they] wish[] later to claim that [they were] denied that right." State v. Wilson, 227 N.J. 534, 543 (2017) (quoting Williams, 219 N.J. at 93).

Furthermore, it is well-recognized that as a matter of trial strategy, defense counsel may refrain from raising a Confrontation Clause objection to testimony "that may inure to the advantage of the defendant." Williams, 219 N.J. at 99. "[W]hen a defendant later claims that a trial court was mistaken for allowing [them] to pursue a chosen strategy—a strategy not unreasonable on its face but one that did not result in a favorable outcome—[their] claim may be barred by the invited-error doctrine." Id. at 100 (citing State v. A.R., 213 N.J. 542, 561-62 (2013), then citing N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340 (2010)).

"The invited error doctrine is intended to 'prevent defendants from manipulating the system' and will apply 'when a defendant in some way has led the court into error' while pursuing a tactical advantage that does not work as planned." Ibid. (quoting A.R., 213 N.J. at 561-62). Thus, "if a party has 'invited' the error, he is barred from raising an objection for the first time on appeal." A.R., 213 N.J. at 561 (citing M.C. III, 201 N.J. at 342).

Here, defendant failed to raise any objection to the ACPD detective's and the security specialist's testimony that the casino-hotel was aware of the suspect's identity as defendant and provided them with a known image of defendant. Defendant now asserts for the first time on appeal that no person from the casino-hotel testified about how they were able to identify defendant as the suspect or why they were in possession of a photograph of him to share with police. But defendant's pretrial motion to preclude any mention of the domestic violence incident is the reason why the State did not elicit this information before the jury.

We add that several casino security officers testified at trial. Defendant thus had the opportunity to cross-examine them about how they were aware of defendant, why they had a picture of him, and most importantly, how they were able to identify him as a suspect. We are satisfied the defense made a strategic decision not to object to their sanitized testimony and not to explore the true basis for their knowledge on cross-examination.

For the sake of argument, were we to assume that the officer's testimony was improper under the Confrontation Clause, "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard." State v. Singh, 245 N.J. 1, 13 (2021) (citing R. 2:10-2); see also State

20

v. Nelson, 173 N.J. 417, 471 (2002) (holding that a failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial).

"Plain error is a high bar[.]" State v. Santamaria, 236 N.J. 390, 404 (2019). "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" Singh, 245 N.J. at 13 (quoting R. 2:10-2). "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." Ibid. (quoting State v. R.K. 220 N.J. 444, 456 (2015)).

Importantly, moreover, "[t]o determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.' " Id. at 13-14 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). In the context of the identification of the culprit, "when a case is fortified by substantial credible evidence—for example, direct identification of the defendant—the testimony is not likely to be prejudicial under the 'plain error' rule." State v. Irving, 114 N.J. 427, 448 (1989) (citing State v. Douglas, 204 N.J. Super. 265, 275 (App. Div. 1985)).

Here, there was substantial credible evidence—indeed, overwhelming evidence—identifying defendant as the person who sexually assaulted N.K.

A-0532-22

Defendant's DNA was found in the semen deposited in the victim's cervix, vagina, and underwear. Additionally, defendant was the source of the DNA found on N.K.'s foot, which corroborates the victim's claim that the perpetrator licked it.

IV.

We turn next to defendant's contention that the trial judge erred by allowing law enforcement officers at trial to present inappropriate lay opinion testimony in violation of the Confrontation Clause and N.J.R.E. 701. Defendant raises two distinct arguments regarding testimony related to the surveillance video. He first contends that the ACPD detective and the casino-hotel security specialist both offered improper lay opinion testimony in violation of N.J.R.E. 701 as to the identity of the suspect in the surveillance videos. He also claims that the security specialist's testimony that the hoodie sweatshirt he found in the parking garage trash can resembled the shirt he observed "the subject" wearing and carrying in the surveillance video also violated N.J.R.E. 701. We address each argument in turn.

22

A.

The State argues that both the security specialist and the detective presented fact testimony—not opinion testimony—explaining what they did when they were informed that casino-hotel personnel were aware of the suspect's identity and were provided with a photograph of the suspect, known to be defendant. But even accepting, for purposes of argument, that their testimony was improper as to the identity of the suspected rapist, the admission of the testimony challenged for the first time on appeal does not rise to the level of plain error.

In Singh, a detective testifying at trial referred to the suspect in the video as "the defendant" twice in narrating the surveillance footage. 245 N.J. at 18. The Supreme Court determined that although it was error for the detective to refer to an individual depicted in the surveillance video as the defendant during the narration of that video, "that error was harmless given the fleeting nature of the comment and the fact that the detective referenced defendant as 'the suspect' for the majority of his testimony." Id. at 17.

As in Singh, the security specialist referred to the person in the surveillance video as "the subject" for the majority of his narration testimony. He only referred to the person in the video as "Jamel" once.

Afterwards, the detective—who did not provide any narration of the surveillance video—testified that he was made aware of the identity of the suspect as defendant, and, upon reviewing the surveillance video, observed that "Mr. Carlton . . . he had on a gr[a]y sweatshirt, black pants and black colored Air Jordan sneakers[.]"  In all, defendant was referred to by name as the person depicted in the surveillance video twice by two separate witnesses who testified several days apart from one another.

We do not mean to suggest those references to defendant by name or by using the phrase "the defendant" were appropriate.  But in light of the overwhelming evidence of defendant's guilt established through competent admissible testimony, we decline to invalidate the jury verdict based on these isolated misstatements.  See id., 245 N.J. at 13-14  ("[t]o determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'") (quoting State v. Sanchez-Medina, 231 N.J. at 468).

B.

We next address whether the security specialist's testimony regarding the shirt found in a trash can was improper lay opinion.  Lay witness opinion testimony is governed by N.J.R.E. 701.  As the Court emphasized in Singh, "lay

24

opinion testimony can be admitted only 'if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function.'" Singh, 245 N.J. at 14 (quoting State v. McLean, 205 N.J. 438, 456 (2011)). "The first prong of N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's 'perception,' which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Ibid. (citing McLean, 205 N.J. at 457). "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 14-15 (citing McLean, 205 N.J. at 460).

The second requirement is that lay-witness opinion testimony be "limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 15 (quoting McLean, 205 N.J. at 458).

In Singh, the Court concluded that a detective's testimony comparing the sneakers he observed on surveillance video to the sneakers he observed defendant wearing when he arrested defendant was proper lay opinion testimony under N.J.R.E. 701. 245 N.J. at 18-19. First, the Court determined the detective had first-hand knowledge of what the sneakers looked like, having seen them on

25

defendant. Id. at 19-20. The Court thus concluded that the detective's "lay opinion as to the similarities between the sneakers from the surveillance footage and the sneakers he saw that night was rationally based on his perception[.]" Ibid.

As to the second prong in the N.J.R.E. 701 framework, the Singh Court found that the detective's testimony as to the similarities between the sneakers was helpful to the jury because he "had first-hand knowledge of what the sneakers looked like[.]" Id. at 20. The Court reasoned that "[s]imply because the jury may have been able to evaluate whether the sneakers were similar to those in the video does not mean that [the detective's] testimony was unhelpful[,] [n]or does it mean that [the detective's] testimony usurped the jury's role in comparing the sneakers." Ibid.

In the matter before us, the security specialist's testimony likewise satisfies the requirements of N.J.R.E. 701. He testified that he observed the "subject" on the third floor of the parking garage with a polo shirt in his hand during one portion of the video surveillance, but a few seconds later in the next camera view, defendant was no longer holding the shirt. The security specialist testified that based on this observation, he went to the third floor of the parking

26

garage, checked a trash can located at the entrance, and found "[t]he missing shirt from the video frame" which "appeared to be a gr[a]y polo hoodie."

While those circumstances are distinguishable from what occurred in Singh, we are not persuaded that a different result must be reached simply because the security specialist did not personally see defendant wearing the gray polo hoodie. All that is required is that the witness have "first-hand knowledge" as to what the item of clothing looked like. That requirement was satisfied when the security specialist retrieved the discarded shirt.

Furthermore, although the hoodie was admitted into evidence for the jury to make its own comparison, Singh made clear that circumstance does not automatically mean that the security specialist's testimony was unhelpful or usurped the jury's role. The Court stressed, "[t]here is no requirement in N.J.R.E. 701 that the testifying lay witness be superior to the jury in evaluating an item." Singh, 245 N.J. at 19.

In this instance, because defendant failed to object, the trial judge had no opportunity to address the N.J.R.E. 701 issue and make findings. We are satisfied that because the security specialist had "first-hand knowledge" of what the gray polo hoodie looked like after finding it discarded in the trash can, his

27

comparison of the retrieved hoodie to the one shown in the video was helpful to the jury in evaluating whether the hoodies were similar.

Finally, and at the risk of undue repetition, even if this portion of the security specialist's testimony were deemed to be improper, such error does not amount to plain error in light of the overwhelming evidence, including DNA evidence, that it was defendant who sexually assaulted the victim.

V.

That brings us to defendant's contention the trial judge erred in preventing the defense from introducing into evidence a newspaper article from 2005 discussing a prostitution operation controlled by casino hosts,[5] and by precluding the defense from presenting forensic evidence showing an unidentified minor DNA profile found on N.K's cervical swab.

A trial judge's evidentiary rulings should be upheld "absent a showing of an abuse of discretion." State v. Perry, 225 N.J. 222, 233 (2016) (citations omitted). The law is well-settled that an appellate court should not substitute its judgment for that of the trial judge unless the trial judge's ruling is "so wide of

---

[5] The article discussed how three former casino hosts from the same casino-hotel where the present incident occurred were "blacklisted" by the Casino Control Commission because they recruited Malaysian and East Asian women for a brothel in Philadelphia.

the mark that a manifest denial of justice resulted." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

## A.

We conclude the trial judge did not abuse her discretion in preventing defendant from cross-examining witnesses about an article published thirteen years prior to the sexual assault of N.K. The trial judge found that the article has no nexus to the present case, "which involves a middle[-]aged woman who is an employee of the casino, who has no prior arrests or record of prostitution." We do not hesitate to conclude the trial judge properly precluded any such evidence concerning past casino-related prostitution activities given that there was no evidence that N.K. was involved in prostitution.

## B.

We next address the trial judge's decision to preclude evidence of a minor unidentified DNA profile that was detected on a swab obtained from N.K.'s cervix. Defendant argued the third-party DNA could have identified another person as the assailant, or additional parties who might have testified N.K. was providing sex in exchange for money at the casino-hotel.

"The introduction of evidence of a victim's prior sexual conduct is governed by New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7[.]" Perry, 225

N.J. at 234. That statute "is designed to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim and does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character." Ibid. (citations and internal quotations omitted).

The statute "defines 'sexual conduct' as 'any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement and life style." Perry, 225 N.J. at 234 (quoting N.J.S.A. 2C:14-7(f)). In the present matter, the minor DNA profile found from a swab of the victim's cervix falls squarely within the statutory definition. See id. at 240 (finding a semen stain found on the victim's underwear falls under the definition of sexual conduct).

Determining the admissibility of evidence of a victim's prior sexual conduct requires a two-step analysis: (1) whether the evidence is relevant and necessary to resolve a material issue in light of other evidence that is available to address that issue; and (2) whether the probative value of the contested evidence outweighs the prejudicial effect to the victim in the context of the Rape

Shield Law. Id. at 236-37. "The determination of whether evidence of a victim's prior sexual conduct is admissible 'is exquisitely fact-sensitive' and 'depends on the facts of each case.'" Id. at 238 (quoting State v. J.D., 211 N.J. 344, 358 (2012)). Under the first prong, N.J.R.E. 401 defines relevant evidence as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." See State v. Jenewicz, 193 N.J. 440, 457-58 (2008). That analysis focuses on "the logical connections between the proffered evidence and a fact in issue." State v. Schnabel, 196 N.J. 116, 130 (2008) (quoting State v. Williams, 190 N.J. 114, 123 (2007)).

The second prong requires the court to determine whether the probative value of the contested evidence outweighs its prejudicial effect on the victim. Perry, 225 N.J. at 237 (citing State v. Budis, 125 N.J. 519, 532 (1991)). "Under the Rape Shield Law, the probative value of the victim's prior sexual conduct 'depends on clear proof that the conduct occurred, that it is relevant to a material issue in the case, and that it is necessary to a defense.'" Ibid. (quoting State v. J.A.C., 210 N.J. 281, 300 (2012)). On the other hand, "[t]he prejudice contemplated by the Rape Shield Law includes the trauma to the victim, the degree to which the evidence sought to be admitted would invade the victim's privacy, the 'impact of a given ruling on a victim reporting sexual abuse,' as well

31

as the need to guard victims from excessive cross-examination and prevent undue jury confusion." Ibid. (quoting J.A.C., 210 N.J. at 300).

In Perry, the defendant sought to admit evidence of an unknown man's semen deposited on the victim's shorts, claiming it was relevant to support his theory of either consent or third-party guilt. 225 N.J. at 240. Our Supreme Court stressed that there was nothing in the record to indicate when the semen was deposited on the shorts, and all the challenged evidence showed was "that some unknown individual engaged in a sexual act with [the victim] at some unknown time." Id. at 241. The Court further reasoned that "without proof that the semen [was] in any way related to the crime here, the DNA evidence of the semen stain on [the victim]'s shorts was not relevant to the issue the jury had to decide[.]" Id. at 242. The Court ultimately determined "the proffered evidence was irrelevant to defendant's consent defense, fails to support the defense of third-party guilt, and was, therefore, properly excluded." Id. at 243.

For essentially the same reasons explained in Perry, here, the trial judge properly denied defendant's attempts to admit the DNA evidence of the unidentified minor profile found on N.K.'s cervical swab. There was no evidence of when it was deposited or who deposited it.

That conclusion is not undermined by defendant's allegation that "defendant's sexual involvement with the victim centered around receiving sex in exchange for money" and his assertion that the third-party DNA would confirm the victim was providing sex for money while working at the casino-hotel. Even assuming, just for the sake of argument, that N.K. had engaged in consensual sex with another party in exchange for money, that evidence would not be admissible to prove the victim had consensual sex with defendant. See State v. Clowney, 299 N.J. Super. 1, 15-16 (App. Div. 1997) (excluding evidence of victim's prior acts of sex with others for money as it was inadmissible to prove the victim had consensual sex with defendant). In sum, the trial judge did not abuse her discretion in precluding the evidence defendant sought to use against the victim.

VI.

We need only briefly address the contentions raised in defendant's self-represented submission. Those arguments lack sufficient merit to warrant extensive discussion. See R. 2:11-3(e)(2).

33

## A.

Defendant asserts for the first time on appeal that his Miranda[6] rights were violated, claiming that he was not advised of those rights. That assertion is belied by the record, which clearly shows that he was advised of his rights and invoked the right to counsel, declining to provide a statement to police. In short, no statement was given to police and thus no statement was offered into evidence at trial.

## B.

Defendant contends that evidence establishing probable cause for the search warrant was falsified. Defendant moved to suppress the DNA evidence obtained pursuant to a search warrant and requested a Franks[7] hearing alleging the warrant contained false or fictitious statements of material fact. Specifically, defendant points to what he characterizes as an inconsistency between what the victim said and what was contained in the affidavit in support of the search warrant: the victim told police that the person who assaulted her was wearing a

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

[7] Franks v. Delaware, 438 U.S. 154 (1978). Our Supreme Court adopted the Franks test in State v. Howery, 80 N.J. 563 (1979).

gray sweater with a hood and black pants, whereas the affidavit stated the suspect was wearing a gray hooded sweatshirt and black jeans.

The trial judge denied defendant's request for a <u>Franks</u> hearing, finding that defendant failed to make the requisite showing that a false statement was made deliberately or in reckless disregard of the truth. The trial judge reasoned that although jeans and pants, as well as a sweater and sweatshirt, are different things, the inconsistencies were "nominal." The trial judge added that even if there were something "more nefarious" here, there was other information in the affidavit that amply established probable cause to support issuance of the warrant.

We agree with the trial judge that defendant failed to establish by a preponderance of the evidence that the allegedly false statement in the affidavit was made either deliberately or in reckless disregard of the truth. <u>See</u> <u>State v. Desir</u>, 245 N.J. 179, 195-99 (2021). We also agree that even assuming for the sake of argument that defendant had established the first prong of the <u>Franks</u>/<u>Howery</u> test, any such false statement was not material in view of additional information in the warrant application that established probable cause to justify the warrant. <u>See</u> <u>id.</u> at 197.

## C.

Defendant alleges the State violated his right to a speedy trial. See Barker v. Wingo, 407 U.S. 514 (1972). But he cites to no instances in which the State caused any of the delay he now complains about. His speedy trial claim is therefore baseless.

## D.

Defendant claims for the first time on appeal that the trial judge erred by "refus[ing] to put the time of the crime in the [j]ury [c]harge." It is well-settled that "[i]f the defendant does not object to the [jury] charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012) (citing State v. Macon, 57 N.J. 325, 333-34 (1971)). Accordingly, "[a]ppellate review applies the plain-error standard when a defendant fails to object to a given jury charge." Ibid. (citing R. 1:7-2, then citing State v. Wakefield, 190 N.J. 397, 473 (2007)).

At trial, defendant did not challenge the jury instruction on the grounds it failed to mention the time of the crime. Nor did defendant request that the judge give such an instruction. In any event, it would have been inappropriate for the trial judge to instruct the jury on when exactly the sexual attack occurred. The

time at which the crime was committed is a question of fact for the jury to determine based on the evidence presented.

Notably, during their deliberations, the jury asked for the time at which defendant was seen running down the stairwell. In response to that jury request, the prosecutor and defense counsel agreed it was appropriate to show the jury the relevant surveillance footage clip which included timestamps rather than specifically tell the jury the time at which that event occurred.

In sum, the trial judge did not commit error much less plain error by not instructing the jury on when the crime occurred.

E.

Defendant claims the prosecutor committed misconduct on several occasions. "[P]rosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999). We are satisfied that defendant's allegations are meritless.

Defendant baldly claims the prosecutor committed misconduct by being aware of the fact that defendant had been identified as the suspect because of the domestic violence incident that occurred several hours before the attack upon N.K. But of course, a prosecutor is permitted to know facts that would be unduly

prejudicial if revealed to the jury. It was also not misconduct for the prosecutor to seek a superseding indictment to remove all references to the domestic violence incident that appeared in the initial indictment. That was done to safeguard defendant's right to a fair trial, not to gain an unfair advantage.

Defendant also alleges the prosecutor committed misconduct by not turning over fourth-floor surveillance footage. The security specialist testified, however, there was no surveillance camera coverage on the fourth floor. The State consistently represented, moreover, there was no surveillance footage of the fourth-floor hallway. There is, of course, no obligation under our State's "open-file approach to pretrial discovery in criminal matters," State v. Hernandez, 225 N.J. 451, 461 (2016), to turn over something that does not exist.

To the extent we have not specially addressed them, any additional claims of prosecutorial misconduct or other trial errors lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## VII.

We next turn our attention to defendant's sentencing arguments. Following the jury verdict, the State in accordance with Rule 3:21-4(e)[8] filed a motion to sentence defendant to an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). In support of its motion, the State relied on two certified judgments of conviction from New York as well as a printout of defendant's criminal history. Those documents revealed a New York felony conviction on February 26, 2007 for third-degree[9] robbery committed on September 20, 2006 and a New York felony conviction on November 17, 2011 for fourth-degree possession of stolen property committed on May 10, 2011. The trial judge granted the State's motion to sentence defendant to a

---

[8] Rule 3:21-4(e) provides that a motion for an extended term must be filed "within 14 days of the of the entry of the defendant's guilty plea or the return of the verdict." In light of Erlinger, this provision has become obsolete since the prosecutor's decision to seek—or at least preserve the option to seek—a persistent-offender extended term must now be made at a much earlier stage of the prosecution considering the requirement, discussed in section IX, infra, that a grand jury, not just a petit jury, must find certain facts to establish eligibility for a persistent-offender extended term. We recommend the Supreme Court Criminal Practice Committee revise or replace the current rule to account for the new procedures that are needed to comply with Erlinger.

[9] We note that degree classifications under New York law are different from the classifications set forth in N.J.S.A. 2C:43-1(a) and N.J.S.A. 2C:43-6(a).

discretionary extended term as a persistent offender and sentenced defendant to forty-two years in prison, subject to NERA.

In his initial appeal brief, defendant argues the forty-two-year sentence is manifestly excessive. He also contends the trial judge erred in determining defendant was eligible for an extended term as a persistent offender, arguing that although "the third-degree charge in New York is called robbery, the elements of the crime itself are nearly the same as New Jersey's theft from a person charge . . . N.J.S.A. 2C:20-2(b)(d)," which is designated under New Jersey law as a third-degree crime, as distinct from robbery, N.J.S.A. 2C:15-1, which is designated as either a first or second-degree crime.[10]

Defendant also argues that because both New York convictions were for non-violent property crimes, the trial judge should not have relied on them to impose an enhanced sentence. Finally, defendant argues in his initial counseled brief that the trial judge failed to provide reasons to impose the discretionary

---

[10] But even accepting, for argument's sake, that defendant's New York robbery conviction is congruent to a third-degree theft-from-a-person crime under New Jersey law, the fact remains that the New York conviction was punishable by more than one year in prison under New York law, which is all that matters for deciding whether a conviction in another jurisdiction is a prior crime when determining whether a defendant is a persistent offender. See Section X, infra, discussing N.J.S.A. 2C:44-4(c).

extended term after having found defendant eligible for a persistent-offender sentence.

A.

As we have noted, on June 21, 2024—after both defendant and the State filed their initial briefs in this appeal—the United States Supreme Court decided Erlinger, which held that a jury, not the sentencing judge, must decide the existence of the facts necessary to establish the grounds for a sentence enhancement based on prior convictions for offenses committed on separate occasions. 602 U.S. at 849.

In Apprendi, the United States Supreme Court changed the legal landscape for imposing enhanced sentences. The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Erlinger is the latest in a series of Supreme Court decisions explaining that, under the Apprendi doctrine, a jury must find the facts necessary for sentencing enhancements. In Almendarez-Torres v. United States, 523 U.S. 224 (1998), the Court focused on an exception contemplated in the initial formulation of the basic Apprendi rule. Specifically,

41

the Court in <u>Almendarez-Torres</u> reiterated and amplified that the "fact of an earlier conviction" need not be submitted to a jury. 523 U.S. at 224.

In <u>Erlinger</u>, the Court considered the boundaries of that exception, addressing whether a judicial determination that past offenses had been committed on different occasions, which is necessary for enhanced sentencing under the federal Armed Career Criminal Act (ACCA),[11] violated the defendant's Fifth and Sixth Amendment rights. <u>Erlinger</u>, 602 U.S. at 830-34. The majority in <u>Erlinger</u> explained, "[v]irtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." <u>Id.</u> at 834 (alteration in original) (quoting <u>Apprendi</u>, 530 U.S. at 490).

---

[11] ACCA provides, in pertinent part:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years. . . .

> [18 U.S.C. § 924(e)(1).]

42

The majority rejected the government's argument that the "different occasions" inquiry falls under the Almendarez-Torres exception. Id. at 836-38. The majority emphasized that Almendarez-Torres recognizes a "narrow exception" that permits "judges to find only 'the fact of a prior conviction.'" Ibid. (quoting Alleyne v. United States, 570 U.S. 99, 111, n.1 (2013)). The majority explained that "[a] judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.'" Id. at 831, n.3 (quoting Mathis v. United States, 579 U.S. 500, 511-12 (2016)).

The Erlinger majority concluded the enhanced sentence imposed in that case was unconstitutional because:

> To determine whether Mr. Erlinger's prior convictions triggered ACCA's enhanced penalties, the district court had to do more than identify his previous convictions and the legal elements required to sustain them. It had to find that those offenses occurred on at least three separate occasions. And, in doing so, the court did more than Almendarez-Torres allows.
>
> [Id. at 838-38.]

In reaching that conclusion, the Erlinger majority acknowledged that to determine the fact of a prior conviction, a sentencing judge may "need to know the jurisdiction in which the defendant's crime occurred and its date in order to

43

ascertain what legal elements the government had to prove to secure a conviction in that place at that time." Id. at 839. The majority also recognized that to obtain that information, a sentencing judge "may sometimes consult 'a restricted set of materials,' often called Shepard[12] documents, that include judicial records, plea agreements, and colloquies between a judge and the defendant." Ibid. (quotations omitted). Importantly, however, the Erlinger majority emphasized:

> None of that . . . means that a court may use Shepard documents or any other materials for any other purpose. To ensure compliance with the Fifth and Sixth Amendments, a sentencing judge may use the information [the judge] gleans from Shepard documents for the "limited function" of determining the fact of a prior conviction and the then-existing elements of that offense. "[N]o more" is allowed. In particular, a judge may not use information in Shepard documents to decide "what the defendant . . . actually d[id]," or the "means" or "manner" in which [the defendant] committed [their] offense in order to increase the punishment to which [the defendant] might be exposed.
>
> [Id. at 839-40 (citations omitted).]

Applying those principles to the facts in the case before it, the Erlinger majority concluded:

> To determine what legal elements attached to Mr. Erlinger's decades-old offenses, the court might have needed to consult Shepard documents to ascertain the jurisdiction in which they occurred and the date on

---

[12] Shepard v. United States, 544 U.S. 13 (2005).

which they happened.  But the court had no need or authority "to go any further," and assume for itself the responsibility of deciding whether Mr. Erlinger's past offenses differed enough in time, location, character, and purpose to have transpired on different occasions. Let alone undertake that inquiry all with an eye toward increasing his punishment.  The Fifth and Sixth Amendments "contemplat[e] that a jury—not a sentencing court—will find such facts, unanimously and beyond a reasonable doubt."

[Id. at 840 (citations omitted).]

## B.

The New Jersey persistent offender statute provides that upon application of the prosecuting attorney, a person may be sentenced to an extended term of imprisonment if the individual "has been convicted of a crime of the first, second or third degree and is a persistent offender."  N.J.S.A. 2C:44-3(a).  The statute further defines a "persistent offender" as:

> [A] person who at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced.
>
> [Ibid.]

At the time of defendant's sentencing hearing, our Supreme Court's decision in <u>Pierce</u> controlled. The <u>Pierce</u> Court held that a sentencing court "does not engage in impermissible fact-finding when it assesses a prior record of convictions and determines that a defendant is statutorily eligible for a discretionary extended-term as a persistent offender." 188 N.J. at 158. The Court added there was "no Sixth Amendment violation in the sentencing court's consideration of objective facts about defendant's prior convictions, such as the dates of convictions, his age when the offenses were committed, and the elements and degrees of the offenses, in order to determine whether he qualifies as a 'persistent offender.'" <u>Id.</u> at 163. Without question, <u>Erlinger</u> abrogates the rule announced in <u>Pierce</u> with respect to the dates of convictions and a defendant's age when the offenses were committed.[13]

## C.

The State argues in its initial supplemental brief that defendant's "newly minted argument that his extended-term sentence is unconstitutional comes too late." We disagree and decline to impose a procedural bar that would

---

[13] As we explain in Section X, <u>Almendarez-Torres</u> and <u>Erlinger</u> permit a judge to make findings concerning the elements of the earlier crime of conviction. The statutorily-defined elements of a crime are pure legal matters determined by reading the plain text of a statute. <u>See also</u> <u>infra</u>, note 15.

categorically deny defendant a remedy for the constitutional violation that occurred in this case. We see no basis to fault the trial judge, prosecutor, defendant, or his counsel for following the clear rule our Supreme Court announced in <u>Pierce</u> and "for not anticipating a change in law." <u>See</u> <u>State v. Harris</u>, 181 N.J. 391, 436 (2004). While we might be prepared to apply plain error analysis in these circumstances, <u>see</u> <u>United States v. Cotton</u>, 535 U.S. 625 (2002), we are not prepared to categorically disregard an uncontroverted constitutional error simply because no one had the prescience to foretell the holding in <u>Erlinger</u>. <u>Cf. R.</u> 2:10-2.

D.

Turning to the substantive merits of defendant's constitutional challenge to his extended-term sentence, as we have noted, the Attorney General acknowledges the <u>Erlinger</u> rule applies retroactively to persistent-offender cases, like this one, that are still in the direct appeal "pipeline." <u>See</u> <u>State v. Wessells</u>, 209 N.J. 395, 412 (2012) (noting that new rules "for the conduct of criminal prosecutions" are to "be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.") (quoting <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328 (1987)). <u>See also</u> <u>State v. Grate</u>, 220 N.J. 317,

47

335 (2015) (affording pipeline retroactivity to <u>Alleyne</u>,[14] 570 U.S. at 99), and <u>State v. Natale</u>, 184 N.J. 458, 494 (2005) (affording pipeline retroactivity to <u>Blakely v. Washington</u>, 542 U.S. 296 (2004)).  The Attorney General also acknowledges that defendant's Fifth and Sixth Amendment rights as explained in <u>Erlinger</u> were violated when the trial judge, rather than a jury, made factual findings regarding extended-term eligibility beyond the fact of his prior convictions.

Before we address the Attorney General's harmless constitutional error argument, we deem it important to point out that our persistent offender statute requires proof beyond that a defendant committed the prior crimes on separate occasions.  N.J.S.A. 2C:44-3(a) prescribes the following fact-sensitive elements, each of which a unanimous jury must find beyond a reasonable doubt to establish that a defendant is a persistent offender eligible for an extended term of imprisonment: (1) the defendant must have been 21 years of age or older at the time of the commission of the present first, second, or third degree crime for which the extended term is sought; (2) the defendant must have been previously <u>convicted</u> of predicate crimes on at least two separate occasions, meaning the

---

[14]  The Court in <u>Alleyne</u> applied <u>Apprendi</u> to any fact that increases a mandatory minimum sentence, overruling its prior decision in <u>Harris v. United States</u>, 536 U.S. 545 (2002).  570 U.S. at 103.

dates that the prior convictions were entered are different; (3) the defendant must have <u>committed</u> the prior crimes at different times; (4) the defendant must have been at least 18 years of age when the prior crimes were committed; and (5) the latest of the prior crimes, or the date of the defendant's release from confinement when applicable, whichever is later, is within ten years of the date of the crime for which the defendant is being sentenced.

The foregoing factual predicates to enhanced-sentence eligibility are all case-sensitive, meaning that they must be proved on a case-by-case basis by means of the defendant's criminal history records, and cannot be established solely by reading the text of a statute.[15] <u>See</u> N.J.S.A. 2C:44-4(d) ("Any prior conviction may be proved by any evidence, including fingerprint records made in connection with arrest, conviction or imprisonment, that reasonably satisfies the court that the defendant was convicted."). Consider, by way of example, a person less than 18 years of age can be waived to adult court and convicted and sentenced as an adult. <u>See</u> N.J.S.A. 2A:4A-26.1. In those circumstances, the conviction would not constitute a prior crime for purposes of N.J.S.A. 2C:44-

---

[15] Thus, these predicate facts stand in contrast to the prior crimes' statutorily-defined elements or their statutorily-assigned degree, which determines the maximum sentence that can be imposed on those convictions. <u>See</u>, <u>infra</u>, section X.

<span style="float:right">A-0532-22</span>

3(a). We view the determination of a defendant's age at the time of the prior crimes to be comparable, for purposes of Erlinger analysis, to the determination of the dates of those prior crimes that are needed to establish that they were committed on separate occasions.

Although the parties in their initial supplemental briefs focus on the "separate occasions" prerequisite[16] specifically addressed in Erlinger's analysis of ACCA, a unanimous jury must find beyond a reasonable doubt that all five of the above-enumerated factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility.

## VIII.

That brings us to the Attorney General's principal argument that "proceedings prior to the date of Erlinger,[17] where a judge made the requisite

---

[16] Defendant in the last paragraph of his initial supplemental brief also mentions the remoteness element in N.J.S.A. 2C:44-3(a), which requires that the latest prior crime or release from prison, whichever is later, occurred within ten years of the present crime.

[17] As we explain in section VIII(C), infra, the Attorney General appears to be arguing that the harmless error doctrine does not apply equally to cases where the sentencing hearing occurs after Erlinger was decided. Rather, the Attorney General's harmless-constitutional-error argument seems to be confined to "pipeline" cases.

A-0532-22

'separate occasions' findings at sentencing, are subject to harmless error analysis." In support of that contention, the Attorney General cites to Chief Justice Roberts' one-paragraph concurring opinion in Erlinger and to Justice Kavanaugh's dissenting opinion. The Attorney General also cites to the Erlinger oral argument transcript, which purports to show that the parties generally agreed that harmless error review is permitted.[18]

The Attorney General argues because the Erlinger majority "neither repudiated nor otherwise contested" the applicability of the harmless error analysis, we may then excuse the constitutional violation in this instance as harmless error on the grounds that "no 'rational jury' could have found that defendant committed the two prior offenses at the same time." The outcome of this issue hinges on whether we accept the premise that Erlinger violations are amenable to harmless error analysis; to borrow the phraseology our Supreme Court used repeatedly in Pierce, 188 N.J. at 163, 167, 169, there is no reasonable doubt the "objective" facts of defendant's criminal background establish that he is a persistent offender withing the meaning of N.J.S.A. 2C:44-3(a). The critical

---

[18] See Transcript of Oral Argument at 16, 24-25, 44-45, 101-02, Erlinger v. United States, 602 U.S. 821(2024) (No. 23-370).

question is whether the harmless constitutional error doctrine can be invoked to excuse the failure to have a jury decide those facts.

## A.

The harmless constitutional error doctrine is well-accepted in both federal and New Jersey jurisprudence. As our Supreme Court noted in State v. Camacho,"[t]he [United States] Supreme Court has emphasized that 'most constitutional errors can be harmless,' and are therefore not subject to automatic reversal." 218 N.J. 533, 547 (2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991)). That said, the only mention of the harmless constitutional error doctrine in Erlinger is in the Chief Justice's succinct concurring opinion that incorporates by reference an argument raised in Justice Kavanagh's dissenting opinion. Cf. State v. Masi, 72 N.J. Super. 55, 58 (Law Div. 1962) (noting that language in a United States Supreme Court concurring opinion was persuasive but not binding upon the court); Guido v. Duane Morris, LLP, 202 N.J. 79, 91 n.4 (2010) ("A dissent, of course, is not precedent."). As the Attorney General acknowledges, the harmless constitutional error doctrine was not mentioned at all in the majority opinion that announced the constitutional rule we are now charged to enforce and safeguard.

The majority opinion's silence on the question of harmless constitutional error is conspicuous, especially considering that opinion comments freely and repeatedly on other points made in the other Justices' opinions. It appears, moreover, the majority made a conscious decision not to address whether and in what circumstances an <u>Erlinger</u> violation might be deemed harmless error. The majority opinion tellingly states, "[w]hile recognizing Mr. Erlinger was entitled to have a jury resolve ACCA's [separate] occasions inquiry unanimously and beyond a reasonable doubt, we decide no more than that." 602 U.S. at 835.

The Attorney General posits the majority's silence signals acceptance of the Chief Justice's concurring opinion. Perhaps. But it is equally plausible that the majority meant to signal it was <u>un</u>willing to embrace a harmless error exception but was not prepared to tackle the issue directly at this time. Our task in this appeal is to decide an important constitutional question based on legal analysis of what is written in authoritative precedents, not conjecture based on what is <u>not</u> said in those precedents. We decline to speculate on why the <u>Erlinger</u> majority chose not to mention the harmless constitutional error doctrine.

B.

The State also relies on several New Jersey precedents to support its contention the harmless constitutional error doctrine applies to <u>Erlinger</u>

53

violations in pipeline case. For example, the State cites to <u>State v. Johnson</u>, 166 N.J. 523, 546 (2001), noting in that case, despite holding that NERA required a jury determination that a defendant committed a "violent" crime before the sentencing court could impose the statute's eighty-five percent period of parole ineligibility,[19] our Supreme Court concluded there was no need to disturb the defendant's sentence "because the facts adduced at trial establish that the jury made that finding [that the defendant committed a violent crime] beyond a reasonable doubt."

<u>Johnson</u> is distinguishable from the case before us, however, because here no evidence was introduced at trial on whether defendant's prior crimes occurred at different times. Indeed, the jury was never told about defendant's prior crimes. Accordingly, unlike the situation in <u>Johnson</u>, the jury made no finding on the predicate facts needed to establish persistent-offender extended-term eligibility.

The State's reliance on <u>State v. Purnell</u>, 161 N.J. 44 (1999), is also unavailing. In that case, our Supreme Court ruled that the holding in <u>State v.</u>

---

[19] NERA has since been amended. The revised NERA formulation avoids <u>Apprendi</u> issues by specifically designating the crimes that are subject to the eighty-five percent parole ineligibility feature, rather than requiring the sentencing judge to make a fact-sensitive finding that the present crime is "violent."

Anderson, 127 N.J. 191 (1992)—reallocating the fact-finding function from judge to jury on the materiality element of perjury—did not command full retroactive application because it was not "intended to enhance the reliability of the fact-finding process." Purnell, 161 N.J. at 55. In the present matter, however, we are not asked to afford "full" retroactivity to the Erlinger Rule, but rather only pipeline retroactivity to cases pending on direct appeal. And in any event, it does not matter whether the Erlinger rule enhances the reliability of the fact-finding process. The Apprendi/Erlinger doctrine's undergirding rationale is not that juries are better equipped than judges to determine the facts needed to establish extended-term eligibility. Rather, the doctrine is based on the principle that this fact-finding process falls within the realm of the Fifth and Sixth Amendment right to a jury trial.

Nor are we persuaded by the Attorney General's argument that:

> [a]lthough Erlinger now holds that a prior-offense element is an essential element that must be proven to a jury beyond a reasonable doubt, a prior-offense element is not "material," but rather an attendant circumstance that accordingly should be treated differently when considering whether its omission is subject to harmless error review.

We believe the distinction the Attorney General draws between various types of elements misses the mark. Nothing in the Erlinger majority opinion suggests

the constitutional rule it announced is somehow less important because the facts that a jury must find do not fall under the rubric of "material" elements as defined in N.J.S.A. 2C:1-14(i), as distinct from the term "element of an offense" as defined in N.J.S.A. 2C:1-14(h). The terminology distinction the Attorney General would have us draw seems unimportant considering that N.J.S.A. 2C:1-13(a) requires all elements must be proved beyond a reasonable doubt.

More importantly, we read the majority opinion as establishing a fundamental constitutional right, one not easily dispensed with. We see no point in quarreling over the terminology used to characterize the "separate occasions" fact specifically at issue in Erlinger. The majority could not have made more plain that, under the Fifth and Sixth Amendments, a jury is required to find that fact beyond a reasonable doubt as a precondition to imposing an enhanced sentence under ACCA. Stated another way, the Erlinger rule remains a matter of constitutional imperative regardless of whether the "separate occasion" finding is characterized as a "material element," a mere "element," or an "attendant circumstance."

The Attorney General also relies on the United States Supreme Court's decision in Cotton in support of its argument that harmless error review applies to Erlinger pipeline violations. In Cotton, the defendant was charged with

"conspiracy to distribute and to possess with intent to distribute a 'detectable amount ' of cocaine and cocaine base." 535 U.S. at 627-28. The jury found the defendant guilty at trial. Id. at 628. At sentencing, the District Court judge made a finding of drug quantity that implicated enhanced penalties under federal law and thereupon sentenced the defendant to thirty-years imprisonment. Ibid. The defendant did not object to the fact that the sentences were based on an amount of drug quantity not alleged in the indictment. Ibid.

While the defendant's appeal was pending, the Court decided Apprendi. Ibid. The defendant then argued in the Court of Appeals that his sentence was invalid under Apprendi because the issue of drug quantity was neither alleged in the indictment nor submitted to the petit jury. Id. at 628-29. In its decision, the Court of Appeals first noted that because the defendant failed to raise the argument regarding his sentence before the trial judge, plain error review applied. Id. at 629. Applying that standard, the Court of Appeals vacated the defendant's sentence, concluding that "because an indictment setting forth all the essential elements of an offense is both mandatory and jurisdictional, . . . a court is without jurisdiction to . . . impose a sentence for an offense not charged in the indictment." Ibid. Such an error, the Court of Appeals added, seriously

A-0532-22

impacted "the fairness, integrity or public reputation of judicial proceedings." Ibid.

The United States Supreme Court reversed. Ibid. After concluding that the District Court judge did have jurisdiction, the Supreme Court also applied the plain error test but found that while the error was indeed "plain," id. at 631-32, it "did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." Id. at 632-33. The Court concluded that the evidence of drug quantity presented at the defendant's trial was "overwhelming" and "essentially uncontroverted." Id. at 633. Specifically, the Court referred to testimony from police officers regarding the drugs seized, and the testimony from one of the defendant's co-conspirator's regarding the amount she witnessed being bagged. Ibid.

The situation in Cotton is starkly different from the facts in the matter before us. In Cotton, the Court stressed that there was overwhelming evidence of drug quantity presented at the defendant's trial. Ibid. Here, in contrast, the jury heard no evidence concerning defendant's prior New York convictions. Thus, while the facts needed to establish persistent-offender extended-term eligibility may well be "overwhelming" and "essentially uncontroverted" as in

A-0532-22

Cotton, ibid.—a circumstance we discuss in the next subsection—those facts were not presented to the jury, which is the crux of the Erlinger violation.

## C.

That leads us to examine the fundamental essence of the harmless error analysis, which considers, ultimately, whether the outcome would have been different if the error had not occurred. Importantly, the Erlinger majority explicitly rejected the argument that a jury verdict is not required when the predicate facts for an enhanced sentence are so "'straightforward' that sending it to a jury would be pointlessly inefficient." 602 U.S. at 839 (citation to amicus brief omitted). The majority opinion later underscored that point, explaining:

> Often, a defendant's past offenses will be different enough and separated by enough time and space that there is little question [the defendant] committed them on separate occasions. But none of that means a judge rather than a jury should make the call. There is no efficiency exception to the Fifth and Sixth Amendments. In a free society respectful of the individual, a criminal defendant enjoys the right to hold the government to the burden of proving its case beyond a reasonable doubt to a unanimous jury of his peers "regardless of how overwhelmin[g]" the evidence may seem to a judge.
>
> [Id. at 842 (quoting Rose v. Clark, 478 U.S. 570, 578 (1986)).]

That admonition is in tension—if not fundamentally inconsistent—with the inherent focus in harmless error analysis on whether the outcome would have been the same had the error not occurred considering the weight of the properly-admitted evidence. In this instance, the Attorney General argues, "the 'overwhelming' and 'uncontested' evidence leaves no doubt that defendant was a persistent offender," citing Neder v. United States, 527 U.S. 1, 17 (1999). That assessment may well be true but begs the question of whether, after Erlinger, the decision on extended-term eligibility can be kept entirely from a jury and yet affirmed on the grounds the factual basis for an extended term is overwhelming. Neder involved the failure to instruct the jury on an element of the charged crime that was "uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." 527 U.S. at 17. The Court concluded the error "did not contribute to the verdict obtained," and thus was properly found to be harmless. Ibid. (quoting Chapman v. California., 386 U.S. 18, 24 (1967)).

But even putting aside that in this case no evidence relevant to defendant's persistent-offender status was presented to the jury, the Attorney General's reasoning is hard to reconcile with the Erlinger majority's clear holding that the "separate occasions" decision under ACCA had to be made by

A-0532-22

a jury "regardless of how overwhelming the evidence may seem to a judge."

Erlinger, 602 U.S. at 842 (quotation marks and citation omitted).[20]

In view of the Erlinger majority's unambiguous rejection of the notion that overwhelming evidence obviates the need to have a jury make the decision, we are not convinced the constitutional violation in this case can be "disregarded" under the plain error rule or any other species of harmless error analysis. Cf. Rule 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court."). Furthermore, as we have noted, the Attorney General acknowledged at oral argument that its harmless error argument would likely apply to the vast majority of pipeline cases. As a practical matter, that suggests, if given a foothold in pipeline cases, the harmless error exception might swallow the Erlinger rule.

---

[20] We note that in the portion of his dissent discussing harmless error, Justice Kavanaugh reasons that "[i]n most (if not all) cases, the fact that a judge rather than a jury applied ACCA's different-occasions requirement will be harmless. Whether prior felonies occurred on different occasions under ACCA is usually a straightforward question." Erlinger, 602 U.S. at 859 (Kavanaugh, J., dissenting). That rationale for applying the harmless error rule is at odds with the majority opinion's holding that a jury must make the enhanced sentence findings notwithstanding that the outcome is straightforward. Id. at 841.

A-0532-22

More fundamentally, we are not convinced from our reading of the Erlinger majority opinion that the Fifth and Sixth Amendment right to have a jury decide fact-sensitive enhanced-sentence eligibility is less important or inviolable than the right to have a jury decide the fact-sensitive question of guilt. Certainly, denying a criminal defendant a jury trial on the question of factual guilt can never be deemed harmless constitutional error on the grounds that the State's proofs are so overwhelming as to render a guilty verdict a foregone conclusion. A key question the State's harmless constitutional error argument raises, therefore, is whether the Fifth and Sixth Amendment rights recognized in Erlinger regarding the determination of enhanced-sentence eligibility are deserving of less vigorous protection than the right to a jury trial on factual guilt or innocence.

Based on the opinion's clear directive, we are reticent to conclude that the Erlinger majority meant for the constitutional rights recognized in Apprendi and its progeny to be treated essentially as a second-class version of the right to a jury trial. Nothing in the majority opinion supports that proposition, and much of the opinion affirmatively contradicts it, including the section in the opinion that recounts the origins, evolution, and historical importance of the right to a jury trial. See Section II(A), id. at 828-834. We

presume that section would not have been included in the majority opinion if it was the majority's intent to relegate Apprendi-related jury-trial rights to second-class status as compared to the right to a jury trial on the question of guilt or innocence.

Relatedly, the Attorney General's argument suggests the harmless-constitutional-error doctrine should be applied more liberally to pipeline cases than to cases involving the prospective application of the Erlinger rule. The Attorney General's supplemental brief acknowledges that while the trial judge's persistent-offender decision was "in accordance with established practice, that decision is now error under Erlinger because defendant's appeal is on direct review." In the next sentence, the supplemental brief continues, "[b]ut proceedings prior to the date of Erlinger, where a judge made the requisite 'separate occasions' findings at sentencing, are subject to harmless error analysis." The implication is that harmless error analysis either will not apply to proceedings after the date of Erlinger or it will be applied in a different way.

If that is indeed the Attorney General's position, we are unpersuaded. The retroactive application of a constitutional rule to a pipeline case means, simply, the rule applies in that case, presumably with full force and effect. We

63

do not understand pipeline retroactivity to mean that the constitutional rule when applied retrospectively is somehow softened or otherwise enforced less rigorously than in cases where the rule will be applied prospectively. Rather, as we see it, once there is a concession that a constitutional right was violated, that violation is either harmless or not regardless of when it was committed.

While we are mindful of the administrative burdens that will result from remanding a potentially large number of pipeline cases for new jury trials, we are not prepared to hold that the defendants in pipeline case are entitled to less vigorous protection of their Fifth and Sixth Amendment rights than defendants whose crimes, indictments, or trials happen to occur after June 21, 2024. See Erlinger, 602 U.S. at 842 ("There is no efficiency exception to the Fifth and Sixth Amendments."). The notion that there can be any such differentiated enforcement of the Erlinger rule would suggest that there is another de facto retroactivity option,[21] namely partial or attenuated application of a rule to cases

---

[21] The range of retroactivity options includes prospective application only, "full" retroactive application to all cases, including those where the direct appeal has already been decided (e.g., post-conviction relief cases), and pipeline retroactive application to cases where a direct appeal has not yet been decided. See State v. Knight, 145 N.J. 233, 251 (1996) (enumerating the alternatives available which are purely prospective, prospective, pipeline retroactive, and fully retroactive); State v. Dock, 205 N.J. 237, 256 (2011) (explaining the four options in any case to determine the retroactive effect of a new rule of criminal procedure).

A-0532-22

pending direct appeal. We are not familiar with any such permutation in New Jersey or federal retroactivity jurisprudence.

We do not mean to suggest that the harmless constitutional error doctrine can never apply to an Erlinger violation. But this is not a situation, for example, where a jury was provided with a flawed special verdict form or faulty instructions that were not objected to by the defense.[22] Nor is this a situation where a jury was asked to make findings on some but not all the facts needed to establish the basis for an enhanced sentence. Here, none of the required findings that we have enumerated were submitted to a jury. The violation, in other words, amounts to a complete and absolute denial of the right to a jury trial on the sentence-enhancement determination.

For all these reasons, we decline to put the cart before the proverbial horse by excusing the failure to have a jury decide defendant's extended-term eligibility on the grounds that affording a new jury trial on remand is highly

---

[22] We offer no guidance in this opinion on the jury instructions that should be given in cases that are remanded for new jury trials whose scope is limited to determining whether the defendant is eligible for an extended term as a persistent offender. We expect the Supreme Court Model Jury Charge (Criminal) Committee and Supreme Court Criminal Practice Committee will, respectively, develop model jury charges, special verdict forms, and uniform practices and procedures for cases remanded to rectify violations of the Erlinger rule.

unlikely to produce a different result than the one reached by the sentencing judge. Until the United States Supreme Court has an opportunity to more fully address the practical implications of the Erlinger rule, including whether and in what circumstances harmless error analysis is appropriate, we decline to disregard the uncontroverted constitutional violation that occurred in this case.

IX.

Defendant argues in his initial supplemental brief he also was denied the right to have a grand jury determine the facts needed to establish extended-term eligibility. During oral argument, the Attorney General acknowledged that going forward, the facts that a petit jury must find under the Erlinger rule must also be presented to and found by a grand jury.[23] See State v. Rodriguez, 234 N.J. Super. 298, 304-05 (App. Div. 1989) ("Generally, facts which will aggravate the crime of which a defendant is accused and enhance the punishment to which he will be subject are said to be an 'element' of the offense, N.J.S.A.

_____

[23] We note there is precedent for "bifurcating" a presentation to a grand jury so that the grand jury first determines whether there is probable cause the defendant committed an offense and then separately considers whether there is probable cause to believe the defendant has prior conviction(s) when that is an element of the crime charged. We understand that process occurs routinely in cases where a defendant is indicted for possession of a firearm by a previously-convicted person (commonly referred to as the "certain persons" offense), N.J.S.A. 2C:39-7.

2C:1-14(h), and must therefore be charged in the indictment.") (citing State v. Ingram, 98 N.J. 489 (1985)); see also State v. Franklin, 184 N.J. 516, 534 (2005) ("That a defendant possessed a gun during the commission of a crime is a fact that must be presented to a grand jury and found by a petit jury beyond a reasonable doubt if the court intends to rely on it to impose a sentence exceeding the statutory maximum.").

The question remains what to do about pipeline cases. We hold that in cases such as this one that are remanded, the lack of a grand jury determination regarding extended-term eligibility will be rendered harmless not because the relevant facts are straightforward, but rather because a unanimous petit jury applying a much higher standard of proof than the one needed to return an indictment will find those facts. Stated another way, we see no need to remand for both a grand jury and petit jury to make the factual determinations that Erlinger requires.

We add that in these pipeline cases, a new indictment is not needed to provide defendants notice of the facts that must be considered by a grand jury going forward. See State v. LeFurge, 101 N.J. 404, 415 (1986) (holding that the grand jury right is fulfilled when an indictment "inform[s] the defendant of the offense charged against him, so that he may adequately prepare his defense" and

is "sufficiently specific" both "to enable the defendant to avoid a subsequent prosecution for the same offense" and "'to preclude the substitution by a trial jury of an offense which the grand jury did not in fact consider or charge.'") (quoting first State v. Lefante, 12 N.J. 505, 509 (1953) and then State v. Boratto, 80 N.J. 506, 519 (1979)). Relatedly, pipeline cases such as this one have been scrutinized by a judge who has reviewed defendant's eligibility for an extended term of imprisonment. In these circumstances, defendant is on clear notice as to the fact-sensitive questions that a petit jury must resolve on remand; there is no need for further clarification in the form of an indictment.

In sum, despite our reluctance to embrace the harmless constitutional error doctrine to avoid a rash of new jury trials, we confidently apply the harmless error principle to grand jury proceedings in pipeline cases in view of the well-established principle that when a petit jury finds a defendant guilty, errors before a grand jury are deemed harmless. See State v. Simon, 421 N.J. Super. 547, 551 (App. Div. 2011) (noting that "a guilty verdict is universally considered to render error in the grand jury process harmless"); State v. Ball, 268 N.J. Super. 72, 120 (App. Div. 1993) (concluding that "procedural irregularities in a grand jury proceeding are rendered harmless where defendant is ultimately found

guilty by a petit jury"); see also State v. Warmbrun, 277 N.J. Super. 51, 61 (App. Div. 1994).

X.

Having addressed the constitutional issues broached in Erlinger, we take a step back to address defendant's contention raised in his initial appeal brief that his prior New York convictions do not satisfy the requirements for persistent-offender extended-term eligibility. That contention lacks merit. N.J.S.A. 2C:44-4(c) provides that "[a] conviction in another jurisdiction shall constitute a prior conviction of a crime if a sentence of imprisonment in excess of one year was authorized under the law of the other jurisdiction." Our review of the relevant New York statutes shows that for both of defendant's prior crimes, the maximum sentence authorized by statute was in excess of one year. Specifically, defendant has two felony convictions for robbery in the third degree, N.Y. Penal Law § 160.05, and criminal possession of a stolen property (credit card) in the fourth degree, N.Y. Penal Law § 165.45. See N.Y. Penal Law § 70.00. (listing authorized sentencing of imprisonment for felonies).

In the interests of completeness, we deem it necessary to consider whether, under the Erlinger framework, it is for a judge or jury to determine that the authorized sentence for an out-of-state conviction exceeds one year of

imprisonment.  Although we exercise great caution before allowing a judge to decide any prerequisite to persistent-offender eligibility, we are satisfied that the maximum sentence authorized by another state's law is not a case-sensitive factual question akin to, for example, when a criminal act was committed or when a defendant was found guilty by a jury verdict or guilty plea.  See supra note 15.  Rather, we deem the determination of the maximum authorized sentence for a prior crime to be a pure legal matter comparable to ascertaining the elements of the predicate offense.  We note in this regard the majority in Erlinger re-affirmed that under the Almendarez-Torres exemption from the strictures of the Apprendi rule, a judge may determine "the fact of a prior conviction and the then-existing elements of that offense."  Erlinger, 602 U.S. at 839 (emphasis added) (citing Descamps v. United States, 570 U.S. 254, 260 (2013)).  The majority added, "[u]nder that exception, a judge may "do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of."  Ibid. (emphasis added) (citing Mathis, 579 U.S. at 511-12).

Accordingly, and even at the risk of stretching the Almendarez-Torres exception slightly, we deem the statutorily-prescribed maximum authorized sentence for a crime for which the defendant has already been convicted by jury

verdict or guilty plea is comparable to the statutorily-prescribed elements of that crime. Because both circumstances are pure legal questions determined solely by reading statutory plain text, a judge both can and should decide them.

XI.

Finally, we consider what the appropriate remedy should be for the Erlinger violation. Having determined the constitutional violation in this case should not be excused under the harmless constitutional error doctrine, it is clear defendant's extended-term sentence must be vacated. The question then becomes whether to remand for a jury trial to determine his eligibility for an extended term as a persistent offender or forego persistent-offender enhancement because the statutory language that a court determine defendant's eligibility is not amenable to a saving construction, thus requiring a remand for the trial court to impose a sentence within the "ordinary" range, see N.J.S.A. 2C:43-6(a).

Defendant argues in his second supplemental brief that the latter option is required because N.J.S.A. 2C:44-3(a) "makes no provision for empanelment of a jury solely to determine whether defendant qualifies for the extended term sentence." Defendant asserts that "[t]he persistent offender statute unambiguously provides that if the court 'finds one or more of the grounds

specified in subsection a,' which defines a persistent offender, then the court may sentence the defendant to an extended term." Defendant contends the plain language[24] of the statute precludes us from interpreting it to permit a jury, rather than a court, to make the required findings to establish eligibility for an extended term of imprisonment as a persistent offender. The consequence of defendant's plain language contention is that N.J.S.A. 2C:44-3(a) cannot be applied to him—

---

[24] Although the general rule is that courts do not resort to extrinsic interpretative aids when statutory text is unambiguous, see Malzberg v. Josey, 473 N.J. Super. 537, 546 (App. Div. 2022), we note the legislative history of N.J.S.A. 2C:44-3 confirms the Legislature made a conscious election to have judges rather than juries determine whether to impose a persistent offender extended term of imprisonment. See The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission, Vol. II: Commentary at 329 (1971) (Final Report). The Final Report explains with respect to proposed 2C:44-3, "[t]he Code calls for court determination of these issues [referring to the various extended term provisions] rather than a jury verdict." Ibid. It further explains, "[t]he Code's view is based on the position that 'since the issue bears entirely on the nature of the sentence, rather than on guilt or innocence, we see no reason why a jury trial should be accorded in a system where questions of sentence otherwise are for determination by the Court.'" Ibid. (citing MPC T.D. 2, p. 42 (1954)).

That determination presupposed the Constitution does not accord any such right. Of course, the drafters of the 1954 Model Penal Code and 1971 Final Report had no way of knowing the United States Supreme Court decades later would hold that a jury must make certain factual findings for the persistent offender enhanced sentence as a matter of constitutional right. As we explain, our construction of N.J.S.A. 2C:44-3(a) is fundamentally consistent with the Legislature's clearly expressed intention that the discretion to impose the enhanced sentence should rest ultimately with a judge.

or any other defendant—unless and until the Legislature revises the statutory framework to provide that a jury make the required factual findings.

We note that any such legislation could not be applied retroactively. See State v. Brown, 245 N.J. 78, 88 (2021) (explaining that the prohibition against ex post facto laws in the United States and New Jersey Constitutions "proscribe[s] 'any statute which . . . makes more burdensome the punishment for a crime, after its commission.'") (second alteration in original) (quoting Beazell v. Ohio, 269 U.S. 167, 169 (1925)). Accordingly, if, as defendant contends, a new persistent offender law is needed to comply with the Erlinger rule—as opposed to construing the current statute to allow a jury to make the persistent offender eligibility determination—defendant and other repeat offenders would not face the prospect of such enhanced punishment unless they commit another crime after the new statute's effective date.

To further put defendant's plain language argument in perspective, we highlight the specific language in N.J.S.A. 2C:44-3 that renders the persistent offender provision unconstitutional under Erlinger. The first sentence in the first unlettered paragraph in N.J.S.A. 2C:44-3, which applies to several

73

extended-term provisions including the persistent-offender enhancement,[25]

presently reads:

> The court may, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime of the first, second or third degree to an extended term of imprisonment if _it_ finds one or more of the grounds specified in subsection a., b., c., or f. of this section.
>
> [(Emphasis added to highlight the word that violates the Erlinger rule).]

### A.

Defendant relies principally on our Supreme Court's decision in Grate to support his arguments that: (1) he cannot be tried on the question of extended-term eligibility under the current statutory framework; and (2) we are precluded from performing "judicial surgery" on that framework to accommodate the Erlinger rule. Defendant claims the Court in Grate "confronted a virtually

---

[25] The first sentence in the opening paragraph in N.J.S.A. 2C:44-3 also applies to discretionary extended terms of imprisonment based on whether: the defendant is a "professional criminal" engaged in "continuing criminal activity in concert with two or more other persons" and has "knowingly devoted himself to criminal activity as a major source of livelihood," N.J.S.A. 2C:44-3(b); the defendant "committed the crime as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value the amount of which was unrelated to the proceeds of the crime," N.J.S.A. 2C:44-3(c); or the defendant committed certain designated crimes while in possession of a stolen vehicle, N.J.S.A. 2C:44-3(f). We have no occasion in this appeal to comment on these.

identical problem" to the one raised in his appeal. We disagree. On close inspection, the circumstances extant in Grate are markedly different from the situation now before us. Furthermore, defendant does not address other New Jersey Supreme Court precedents that allowed judicial modification of sentencing enhancement statutes to render them constitutional under the Apprendi doctrine. Those cases, which we discuss in subsection XI(B), convince us that Grate focused on the specific statute before it and did not announce a per se rule precluding judicial modification of statutes that violate Apprendi principles.

The Grate Court addressed a constitutional challenge to N.J.S.A. 2C:39-5(i), which required imposition of a minimum period of parole ineligibility "'if the court finds' a substantial likelihood that the defendant is involved in organized criminal activity." 220 N.J. at 334 (quoting N.J.S.A. 2C:39-5(i)). Specifically, that statute mandated imposition of a five-year minimum term of parole ineligibility:

if the court finds that the aggravating circumstance set forth in . . . N.J.S.[A.] 2C:44-1[(a)(5)] applies.[26] . . . The sentencing court shall make a finding on the record as to whether the aggravating circumstance set forth in . . . N.J.S.[A.] 2C:44-1[(a)(5)] applies, and the court shall presume that there is a substantial likelihood that the defendant is involved in organized criminal activity if there is a substantial likelihood that the defendant is a member of an organization or group that engages in criminal activity. The prosecution at the sentencing hearing shall have the initial burden of producing evidence or information concerning the defendant's membership in such an organization or group.

[N.J.S.A. 2C:39-5(i).]

Grate held that the United States Supreme Court's decision in Alleyne, which extended the Apprendi doctrine to mandatory minimum sentences, rendered N.J.S.A. 2C:39-5(i) unconstitutional. See supra note 14. Further, the Grate Court "decline[d] the State's invitation to perform 'judicial surgery.'" Id. at 335. The Court acknowledged that, "[i]n appropriate cases, a court has the power to engage in judicial surgery or the narrow construction of a statute to free it from constitutional doubt or defect." Ibid. (quoting State v. Fortin, 198

---

[26] N.J.S.A. 2C:44-1(a)(5) establishes a sentencing aggravating factor when "[t]here is a substantial likelihood that the defendant is involved in organized criminal activity." The constitutionality of that aggravating factor is not in question. Rather, the Apprendi-Alleyne problem arose in N.J.S.A. 2C:39-5(i) because that aggravating circumstance was the fact-sensitive predicate for a mandatory minimum term of imprisonment and parole ineligibility.

A-0532-22

N.J. 619, 630 (2009)).  "However," the Court cautioned, "this procedure applies only 'if we can fairly do so.'"  Ibid. (quoting Fortin, 198 N.J. at 631).  See also State v. Higginbotham, 475 N.J. Super. 205, 222 (App. Div. 2023) (citing Grate and adding that the determination of whether a court "fairly can do so" is "based on the Legislature's purpose in enacting the statute").

Because N.J.S.A. 2C:39-5(i) unambiguously required the imposition of a mandatory minimum sentence based on a judicial finding of fact, the Grate Court concluded that "[r]equiring a jury rather than a judge to make such a finding would not merely be severing a constitutionally infirm portion of the sentencing

statute,[27] it would be rewriting its essential requirements." Id. at 336. The Court

added:

> There is no ambiguity in the statute from which we can "assum[e] that the Legislature intended to act in a constitutional manner." Right to Choose v. Byrne, 91 N.J. 287, 311 (1982). It is unclear "'whether the Legislature would want the statute to survive with appropriate modifications rather than succumb to constitutional infirmities.'" State v. Emmons, 397 N.J. Super. 112, 122 (App. Div. 2007) (quoting Byrne, supra, 91 N.J. at 311), certif. denied, 195 N.J. 421 (2008). Thus, that determination is for the Legislature.
>
> [Ibid.]

We do not read the Court's admonition about "rewriting [a constitutionally

infirm statute's] essential requirements" to categorically preclude a judicial

---

[27] We also note the Legislature's mandate regarding partial unconstitutionality which provides:

> If any title, subtitle, chapter, article or section of the Revised Statutes, or of any statute or any provision thereof, shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, such title, subtitle, chapter, article, section or provision shall, to the extent that it is not unconstitutional, invalid or inoperative, be enforced and effectuated, and no such determination shall be deemed to invalidate or make ineffectual the remaining titles, subtitles, chapters, articles, sections or provisions.
>
> [N.J.S.A. 1:1-10.]

construction that reallocates factfinding to a jury when that is constitutionally required, especially since other Court opinions embraced that construction to save statutes from nullification under the <u>Apprendi</u> doctrine.  <u>See</u> Section XI(B).

Nothing in <u>Grate</u> suggests the Court intended to overturn those prior precedents, which defendant did not cite.  Rather, <u>Grate</u> acknowledged the long-accepted principle that "judicial surgery" is permissible provided it is clear that "the Legislature would want the statute to survive with appropriate modifications rather than succumb to constitutional infirmities."  <u>Grate</u>, 220 N.J. at 336.  Thus, <u>Grate</u> did not abrogate the well-settled principle that:

> Even though a statute may be open to a construction which would render it unconstitutional or permit its unconstitutional application, it is the duty of this Court to so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation." <u>Accord</u> <u>State v. LeFurge</u>, 101 N.J. 404, 423 (1986); <u>Town Tobacconist v. Kimmelman</u>, 94 N.J. 85, 104 (1983).  In determining whether a statute is susceptible to a construction that sustains its constitutionality, our primary focus must be on whether the Legislature would prefer the statute to survive as construed.  <u>Right to Choose v. Byrne</u>, 91 N.J. 287, 311(1982).
>
> [<u>State v. Dillihay</u>, 127 N.J. 42, 52 (1992) (quoting <u>State v. Profaci</u>, 56 N.J. 346, 350 (1970)).]

<u>See also</u> <u>State v. Pomianek</u>, 221 N.J. 66, 91 (2015) (The Court "assume[s] that the Legislature would want us to construe [the bias intimidation statute, N.J.S.A.

2C:16-1] in a way that conforms to the Constitution.") (citing State v. Johnson, 166 N.J. 523, 540-41 (2001)).

The task thus falls upon us to discern the Legislature's preference with respect to judicial construction of the persistent offender provision in light of Erlinger. We begin by recognizing that the legislative purpose undergirding the persistent offender statute is to protect the public by deterring and incapacitating repeat offenders. In State v. Dunbar, the Court acknowledged with respect to its interpretation of the persistent offender provision that:

> the general mandate in New Jersey [is] that the provisions of the Code be interpreted to further the general purposes of sentencing as defined in N.J.S.A. 2C:1-2(b), including the insurance of "the public safety by preventing the commission of offenses through the deterrent influence of sentences imposed and the confinement of offenders when required in the interest of public protection."
>
> [108 N.J. 80, 90 (1987) (quoting N.J.S.A. 2C:1-2(b)).]

In State v. Clarity, we further explained "[p]ersistent-offender statutes serve to deter individuals with criminal histories from further criminal behavior by giving notice that they may be subject to extended prison terms for subsequent crimes." 454 N.J. Super. 603, 610-11 (App. Div. 2018). We added, "[t]he [persistent offender] statute was intended to create the judicial discretion to

impose an extended term on an individual incapable of living a law-abiding life for a significant period of time." Id. at 610.

One of the key questions defendant's plain language argument raises is whether that public safety objective would best be served by waiting for the Legislature to determine whether to replace N.J.S.A. 2C:44-3(a) with a new Erlinger-compliant statute, or by interpreting the current statute essentially to replace the word "it" in the first sentence of N.J.S.A. 2C:44-3 with the phrase "a jury" with respect to the persistent offender finding. While the reflexive answer to that question may seem self-evident, we proceed to address it more analytically, starting with a close examination of the holding in Grate, the precedent defendant principally relies upon. That approach leads us to compare the specific statutory provisions at issue in Grate and the matter before us.

While N.J.S.A. 2C:39-5(i) and N.J.S.A. 2C:44-3(a) both run afoul of Apprendi principles, there are significant structural and substantive differences between these two sentencing provisions. Notably, N.J.S.A. 2C:39-5(i) required a factual finding that is qualitatively different from the predicate findings N.J.S.A. 2C:44-3(a) requires. The determination of whether there is "a substantial likelihood that the defendant is involved in organized criminal activity" is hardly "straightforward," to borrow the characterization used

81

repeatedly in <u>Erlinger</u>. On the contrary, the organized-crime sentence enhancement provision could significantly enlarge the breadth and scope of a bifurcated jury trial, potentially opening a floodgate of contested evidence concerning a defendant's personal background to prove affiliation with a street gang, traditional organized crime family, or other "criminal organization or group."

That problem is amplified by the fact that the penal code does not define the terms "organized criminal activity," "criminal organization" or "membership."[28] <u>Cf.</u> N.J.S.A. 2C:33-29(a) (defining "criminal street gang"); N.J.S.A. 2C:41-1(a) (defining "[r]acketeering activity"); and N.J.S.A. 2C:41-1(c) (defining "enterprise" for purposes of a racketeering prosecution). It thus would have fallen upon courts to fill the void by devising adequately precise definitions and by providing suitably detailed instructions to guide a jury's deliberations.

---

[28] It is unclear under N.J.S.A. 2C:39-5(i) whether an occasional or casual relationship with a criminal organization would have been sufficient to constitute "membership," or whether, at the other extreme, the State would have been required to prove, for example, that the defendant was a ranked member of a street gang or a "made" member of a traditional organized crime crew. It appears prosecutors only rarely applied for an enhanced sentence under N.J.S.A. 2C:39-5(i) and so reviewing courts had little opportunity to address its scope in published decisions.

Considering these practical concerns, it is not surprising the Court in Grate ultimately determined it was unclear whether the Legislature would want to assign juries the responsibility to determine whether there is a substantial likelihood a defendant is involved in organized criminal activity. We add, with the benefit of hindsight, the Legislature never amended N.J.S.A. 2C:39-5(i) to render it constitutional after Grate rendered it constitutionally invalid.

The far-ranging trial proofs that might be needed to establish a defendant's membership in a criminal organization for purposes of N.J.S.A. 2C:39-5(i) stand in stark contrast to the simple proofs needed to establish that a defendant is a persistent offender as defined in N.J.S.A. 2C:44-3(a).[29] Indeed, as we have noted, our Supreme Court in Pierce aptly described those facts as "objective." 188 N.J. at 163. While the majority in Erlinger made clear the proofs must be presented to a jury even though they are "straightforward," 602 U.S. at 849, it can hardly be disputed the case-sensitive facts at issue under N.J.S.A. 2C:44-3(a) are indeed straightforward—and typically uncontroverted—based on fingerprint-verified criminal history records and the defendant's date of birth.

---

[29] We note there is no need for courts to compose new definitions to guide juries' deliberations. The operative terms in N.J.S.A. 2C:44-3(a) are already defined. See, e.g., N.J.S.A. 44-4(b) and (c) (defining the terms "prior conviction of a crime" and "prior conviction in another jurisdiction").

Aside from differences in the nature of the proofs needed to impose enhanced punishment under N.J.S.A. 2C:44-3(a) as compared to N.J.S.A. 2C:39-5(i), there are other significant differences between these two statutes that lead us to a different outcome than the one reached in Grate. For example, N.J.S.A. 2C:39-5(i) triggered a mandatory minimum sentence. The persistent-offender provision, in contrast, merely makes a defendant eligible for an extended term of imprisonment to be imposed, ultimately, in the discretion of the sentencing court. Construing the persistent offender statute to allow a jury to perform the factfinding function, therefore, would not restrict the ambit of judicial sentencing discretion. Quite the opposite. Interpreting N.J.S.A. 2C:44-3(a) to comply with Erlinger would expand, not reduce, a judge's discretionary sentencing authority by affording an extended-term option that otherwise would not be authorized. Thus, any reservations the Judiciary and Legislature may have with respect to mandatory sentencing are not implicated here. Cf. Pierce, 188 N.J. at 170 (noting, "we rid our sentencing practice of any ambiguity suggestive of a Sixth Amendment transgression by means of a remedy that preserves what, we believe, the Legislature would prefer—keeping the exercise of sentencing discretion in the hands of courts, not juries") (citing Natale, 184 N.J. at 486). We reiterate and stress that the legislative history of N.J.S.A.

84

2C:44-3(a) confirms the Legislature meant to authorize enhanced punishment for persistent offenders while preserving judicial sentencing discretion. See supra note 24.

Furthermore, N.J.S.A. 2C:39-5(i) relied on a "presumption" and expressly imposed only an initial burden of production on the State. Those features would raise constitutional concerns if applied in the context of a jury trial. Thus, to render the statute suitable for a jury determination applying the proof-beyond-a-reasonable-doubt standard that Apprendi and Alleyne required, significant portions of N.J.S.A. 2C:39-5(i) would have to be surgically deleted. It would not be enough, in other words, merely to substitute the term "jury" for "court." In sharp contrast, our construction of N.J.S.A. 2C:44-3(a) to save it from constitutional demise is achieved, essentially, by modifying a single word in the statutory text.

B.

As the Attorney General correctly notes in his second supplemental reply brief, New Jersey Supreme Court precedents besides Grate provide guidance on when it is appropriate for a reviewing court to construe statutory language to remedy an Apprendi-related infirmity. In Johnson, for example, the Court addressed an Apprendi challenge to the original version of NERA. 166 N.J. at

530.  See supra note 19 (noting NERA has since been amended).  The pre-2001 version required a court to find the present offense was a "violent crime."  The Johnson Court held "the factual predicate for a NERA sentence must be found by a jury under the 'beyond a reasonable doubt' standard."  Id. at 544.  However, the Court did not intimate much less hold that it had no authority to construe the NERA text to remedy the constitutional infirmity by requiring a jury to make the predicate finding rather than a court.  On the contrary, the Court explained, "[w]e solicit the recommendation of our Criminal Practice Committee concerning appropriate procedures, including a NERA jury charge, that will satisfy the requirements of subsection (e) of NERA as thus construed."  Id. at 544 (emphasis added).  The Court added, "[w]e are confident that the Legislature would far prefer our construction of NERA to its potential invalidation under the Due Process Clause."  Ibid.

Relatedly, in State v. Natale (I), 178 N.J. 51 (2003) (per curiam), the Court confirmed that NERA could be construed to permit a jury rather than a court to make a required predicate finding when it held:

> On remand, the State may elect not to proceed to a trial on a NERA predicate in which case the trial court must resentence defendant without application of NERA.  In the event that the State seeks to have the court impose a NERA sentence, the court shall try the NERA issue to a jury and the jury shall determine, applying the

beyond-a-reasonable-doubt standard, whether defendant attempted to cause serious bodily injury or whether defendant caused serious bodily injury upon the victim during the commission of second-degree aggravated assault.

[178 N.J. at 54.]

And in State v. Franklin, 184 N.J. 516 (2005), the Court addressed the impact of Apprendi on the Graves Act second-offender enhanced sentence provision codified in N.J.S.A. 2C:43-6(c), (d), which requires the prosecutor to "establish by a preponderance of the evidence that the weapon used or possessed was a firearm" and expressly provides that factual predicate is to be made by "the court."

Notwithstanding the plain language of the statute, the Court did not hesitate to construe N.J.S.A. 2C:43-6(d) so that it

> no longer will empower judges to decide whether a defendant possessed or used a gun in second-offender cases. In the future, if the State intends to seek an extended term under the Graves Act, it must obtain an indictment charging possession or use of the gun in the commission of one of the designated crimes and then submit the charge to the jury.
>
> [Id. at 539-40.]

Importantly for purposes of the matter before us, the Court in Franklin emphasized, "[w]e will conform the Graves Act to the Constitution in the way

we believe the Legislature would have intended under the present circumstances, rather than let the second-offender provision perish completely." Id. at 539.

C.

Finally, defendant's reliance on a recent New York trial court decision, People v. Banks, 218 N.Y.S.3d 519 (N.Y. Sup. Ct. 2024), does not persuade us.[30] The trial judge in Banks addressed Erlinger in the context of a New York persistent offender statute that expressly barred a jury trial, requiring that the hearing "must be before the court without a jury." Id. at 528 (quoting N.Y. Crim. Proc. Law § 400.15(7)(a)). In view of that explicit prohibition, the judge reasoned that a "saving construction" was not possible. Id. at 533.

The judge also reasoned that "the People's proposal—just go ahead and hold a jury trial—leaves countless questions unanswered, calling for the court to make a slew of policy decisions properly left to the Legislature." Id. at 529. The judge noted, for example, questions concerning the number of peremptory

---

[30] Defendant also cites in his second supplemental brief to State v. Anderson, 552 P.3d 803 (Wash. Ct. App. 2024). However, Anderson did not involve an Erlinger violation and has no bearing on the matter before us.

challenges that should be afforded, and what venue the matter should be heard in. Ibid. The judge also stressed the lack of model jury charges.[31] Ibid.

Here, although our Legislature purposefully assigned the factfinding task to courts and not to juries, see supra note 24, nothing in the text or legislative history of N.J.S.A. 2C:44-3(d) suggests the Legislature meant to categorically prohibit a jury from playing a role in the persistent offender decision-making process if such a role were ever held to be constitutionally required. Clearly, the commentary in the 1971 Final Report presupposed that a defendant has no constitutional right to have the sentencing issue decided by a jury. See Final Report at 329 ("[S]ince the issue bears entirely on the nature of the sentence, rather than guilt or innocence, we see no reason why a jury should be accorded in a system where questions of sentence otherwise are for determination by the Court."). But at the risk of stating the obvious, there would indeed be a "reason

---

[31] As we indicated in note 22, supra, we acknowledge that model jury charges should be drafted to ensure statewide uniformity and avoid errors in instructing the jury. Model jury charges for bifurcated trials after Erlinger would serve as a useful aid to trial courts but the absence of an approved model jury charge does not, of course, preclude a jury trial. See State v. Concepcion, 111 N.J. 373, 379 (1988) (noting that model jury charges are often helpful to trial judges in performing the important function of charging a jury); State v. R.B., 183 N.J. 308, 325 (2005) (noting that the process to adopt model jury charges is "comprehensive and thorough"); State v. O'Donnell, 255 N.J. 60, 79 (2023) (holding that "model [jury] charges are not binding statements of law").

A-0532-22

why a jury should" find the required predicate facts if—as eventually happened—the United States Constitution were interpreted to accord such a right.

Furthermore, none of the practical questions the New York judge in <u>Banks</u> identified dissuade us from our conclusion that N.J.S.A. 2C:44-3(a) can and should be construed to fulfil the Legislature's public safety objectives in providing for enhanced punishment of persistent offenders. We note that in <u>Johnson</u>, our Supreme Court acknowledged similar practical concerns. Its response was to solicit recommendations concerning appropriate procedures, 166 N.J. at 544, not to give up on saving an important sentencing statute.

## D.

In sum, considering the full gamut of our State's "judicial surgery" jurisprudence in view of the specific sentencing enhancement statute presently before us, we conclude it is not "unclear whether the Legislature would want the [persistent-offender] statute to survive with appropriate modifications rather than succumb to constitutional infirmities." <u>Grate</u>, 220 N.J. at 336 (quotation marks omitted). Indeed, it seems implausible the Legislature would prefer to have a large number of recidivist offenders avoid the prospect of enhanced punishment when all that is needed to remedy the <u>Erlinger</u> infirmity is to

90

interpret N.J.S.A. 2C:44-3(a) to allow a jury to make objective and straightforward factual findings.

Articulated another way, defendant is entitled to have a jury decide his eligibility for a persistent offender extended term of imprisonment. He is not entitled to escape the consequences of his criminal history. Allowing the persistent offender statutory framework to "perish," as the Court in Franklin phrased it, 184 N.J. at 539, would needlessly extend a windfall to defendant and a host of other recidivist offenders at the expense of public safety. That, we are not prepared to do.

## XII.

For the foregoing reasons, we vacate defendant's extended term sentence and remand for further proceedings in accordance with the Erlinger rule to have a jury determine whether defendant is eligible for enhanced punishment as a persistent offender. We note the State on remand may elect to forego pursuing an extended term. In that event, defendant shall be resentenced within the "ordinary" range, see N.J.S.A. 2C:43-6(a), for the crimes he was convicted.

We further note the parties may enter into a negotiated post-conviction agreement to avoid the need to convene a jury to decide whether defendant is eligible for an extended term as a persistent offender. If any such post-

conviction agreement contemplates that defendant may be sentenced to an extended term as a persistent offender, the defendant must admit to the facts establishing persistent-offender eligibility in a manner consistent with the entry of a knowing and voluntary guilty plea pursuant to Rule 3:9-2, including the requirement for the defendant to acknowledge the "factual basis" for the plea.

If the State elects to seek imposition of the persistent-offender extended term and there is no post-conviction agreement, the trial judge shall convene a jury for trial limited to the question of whether defendant meets the definition of a persistent offender set forth in N.J.S.A. 2C:44-3(a). The State shall have the burden of proving beyond a reasonable doubt all facts and circumstances needed to establish extended-term eligibility under N.J.S.A. 2C:44-3(a), including not only that the prior convictions were entered on separate occasions and the prior crimes were committed at different times, but also that defendant was 21 years of age or older when the present crime was committed, that defendant was at least eighteen years of age when the prior crimes were committed, and that the latest of the prior convictions or the date of defendant's last release from confinement, whichever is later, is within ten years of the date of the crime for which defendant is being sentenced.

We note in the interest of completeness that under the <u>Erlinger</u> framework as applied to N.J.S.A. 2C:44-3(a), the jury decides only if defendant is eligible for a discretionary extended term as a persistent offender.  The trial judge retains discretion to decide whether to impose an extended term on a defendant that a unanimous jury finds to be eligible for an enhanced sentence.  The judge likewise retains discretion, subject to the rules governing sentencing decisions, in determining the length of the sentence within the extended term range, <u>see</u> N.J.S.A. 2C:43-7(a).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0532-22